First case is NRA National Football League Players Concussion Injury Litigation, numbers 15-2206 et al. And we'll start with, I guess, Mr. Molo. Good morning and may it please the court. It's a pleasure to be back here on this case again. We were here a little bit, almost two years ago, I guess now it was. And at that point in time, the court told us to go back to the district court, and we did, and went through a fairness hearing with Judge Brody and reached a settlement that, in many respects, was quite good. It delivers a lot of great value to the class. However, you're going to be dealing with CTE and what other issues? I'm going to deal with the issue of CTE specifically, how the settlement is unfair based on its treatment of CTE, and how that unfairness arose. I want to address three issues, Judge Abreu. I want to address the problem with CTE in the settlement. I want to address some of the structural defects that caused it, and then what can be done to cure it. And I plan to do that in 10 minutes and 33 seconds. I am reserving two minutes of time for rebuttal to the court that's in mind. I'd appreciate you in rebuttal last, given the fact that I'm arguing first and that we were the lead objector in the district court. Is there anyone besides yourself that you anticipate having taking time for rebuttal? Two minutes for rebuttal. Is there anybody besides yourself? I believe Mr. Epect is going to speak to this question. That's fine. The basic problem with the way the settlement treats CTE is laid out quite clearly in the papers, and it's been the dispute throughout the district court and throughout the papers in this court, is that you can die with CTE the day before the final settlement approval and be awarded up to $4 million and die the day after and get nothing. And that is a problem under both 23A4 and 23E2 and requires reversal. If that's a bad date to draw a line, what date do you propose? Well, what date I propose is there can be different treatment of CTE following the final approval date, but not such a drastic difference where you can get up to $4 million prior to final approval and nothing after Judge Hardiman. The reason for that is that we look to the ultimate question here. We could talk about structural protections. We could talk about whether or not there ought to be a CTE subclass, whether there ought to be additional counsel for people advocating CTE. The bottom line is all of that is only there to assure that what is there at the end of the day in the settlement is fair and that absent class members' rights are adequately being protected. So what date do you propose? I'm sorry? What date do you propose? I would allow the settlement date to remain as it is. However, I would provide, and I would advocate that Judge Brody provide, some form of relief for future claimants of CTE after the final approval date. It doesn't have to be $4 million. There's a lot of meaningful relief that future claimants for CTE can get without having to be paid $4 million. And what do you suggest? I'm sorry? What do you suggest? Well, there's a number of things that can happen. One would be the creation, first of all, there could be back into opt-out rights would be one possibility. As the science develops, people might have the opportunity to opt out later. There could be the opportunity. It might be that that's getting two bites at the apple. You could opt out now. Two bites at the apple, but two bites at the apple only in the context of the situation that we have here where we're trying to reach a fair settlement where, and by the way, we are very much in favor of a settlement, and a settlement as quickly as we can get it to this class which is seriously injured. So that second bite at the apple, the only reason they're not getting that first bite, if you buy the arguments of the NFL and the settlement players, is that there's some ambiguity that it's not as precise a diagnosis of CTE right now in the living. The diagnosis, make no mistake, the diagnosis for CTE right now, post-mortem, is the same pre-final settlement date and post-final settlement date. There's absolutely no difference there. They can diagnose CTE with the exact same amount of certainty today. So the question is what do you do, though, for these future claimants? And I think one thing that can happen is there can be a fund established for people that can provide them with some level of care, of education, some basic therapies like cognitive behavioral therapy has been shown to benefit people with CTE. There are certain types of drug therapies that can occur. And a lot of their clients... And a lot of their living, we can't know that they have CTE, at least at this point in time. Well, first of all, there's a dispute over that, and what is undisputed, because we provided 11 affidavits in the district court from the leading experts in the world that said within five years we should have a definitive diagnosis, and there are those who would say that there are definitive diagnoses now. But let's assume that there aren't. Let's assume that there is at least some way to do it. The best I saw was within five to ten years there's a good possibility that within the living you can diagnose CTE. Correct. And I think it's a little bit stronger than a good possibility, Judge Averill. I think it's a strong likelihood. But be that as it may, the point is a settlement like this, where there is this future claims issue, should account for the evolution of science. I mean, that's what Anaconda Ortiz teaches, that we should at least be able to account for that. And here, this settlement doesn't. It's got this very mushy provision that says the parties shall go back, but the NFL has ultimately the discretion not to engage in any kind of settlement, and at the end of the day, or any kind of modification at the end of the day. Well, that's subject to district court oversight, isn't it? It is. If the district court doesn't oversee that properly, you can be right back here. We could. But I think the better solution would be to find a meaningful way for these people to get relief right now, because it is ultimately a veto right that the NFL has at the end of the day. And in actuality, I mean, the way that that's going to play out is going to be subject to a lot of process, a lot of back and forth, just as it has been up to now. What we want are some kind of rights, some kind of compensation for these claims, which is meaningful. And right now, there is no meaningful compensation. How can we accept that premise when such a small percentage of the class has either opted out or objected? Doesn't that suggest that this is meaningful relief to 98% of the class? Well, no, I respectfully disagree, Judge Hardiman. I think the case law is pretty clear that even one objector, if raising an issue about a fundamental fairness, on fairness in the class or a violation of Rule 23 in some other respect, is enough. And we've certainly done that, and we've done it in a very meaningful way. Well, that's a different issue. That doesn't mean that's a procedural objection, right? No, that doesn't mean that the substance, the meaningfulness of the substance of the settlement doesn't. To say that a group of football players, who in this instance, most of them are truly, you know, there's a big percentage of the class that's wounded, I mean, that is having difficulty with issues that are cognitive issues, that, you know, in many instances, unfortunately, not all of the class, but certain percentages of the class are not people that are the most educated people, that have suffered, you know, financial reversals in their lives after they stopped playing football. They've got other issues, and the record below has evidence of that. And they're not in a position necessarily to make the right decision. It's the district court, right, acting as the fiduciary for the class and class counsel that are to do that. And, you know, one of the problems that we had here was that the named representative for the future claimants, Sean Wooden, doesn't allege that he's at risk of CTE. Now, he does, as Judge Brody, you know, pointed out, allege that he pleaded latent brain injuries, and he pleaded that he was at risk of developing neuromuscular and neurocognitive diseases associated with mild traumatic brain injury, such as dementia, Parkinson's, ALS, and Alzheimer's. Now, he doesn't mention CTE. That isn't a complaint. But you have a logic problem. If you can't diagnose, at least as of today, CT until you're dead, how can somebody who's alive say I necessarily have CTE? He's not saying I have it. He's saying he's at risk of getting it. He's at risk of getting it. And we know that we can diagnose whether or not he has it. Isn't he at risk of getting it? He may be at risk of getting it. I think he probably was at risk of getting it. There's no objection. It's purely procedural. I'm sorry? Isn't the objection purely procedural? Our objection is not procedural because it's substantive, because we then raised this very issue with Wooden and his lawyer in pleadings and other papers that we filed in the district court eight times between the filing of the complaint and the filing of his affidavit in support of final approval of the settlement. At no point in time did Wooden ever change that allegation and say that he was at risk of CTE. He also had a lawyer who was conflicted in the process in that he represented some class members that had current claims as well as being the lawyer for the class rep for future claims. Isn't CTE a form of latent brain injury? CTE is a form of latent brain injury, but it is also an injury that is specifically unique from dementia, Parkinson's, ALS, Alzheimer's. There could be comorbidity, but it is a unique disease, and it happens to be, by the way, the only disease, the only condition that occurs as a result of mild traumatic brain injury. Parkinson's, ALS, Alzheimer's, dementia all occur in the general population and don't require mild traumatic brain injury. CTE does, and CTE was the centerpiece of this complaint when the case began, which is why this conflict is fundamental. This is not line drawing as the NFL, my friend, the professor, would say that this is just merely line drawing. It's not line drawing. It is a fundamental issue in the case. It is mentioned 14 times in the complaint. The next most mentioned disease is mentioned eight times. It is when the district court, I think, dealt with that, but it sounds like you're saying that the illnesses that Wooden claims he's at risk of, excuse me, are not proper proxies for CTE. Is that what you're saying? They're clearly not proper proxies for CTE. So therefore we can't put any stock in the awards that are given for Parkinson's and dementia and Alzheimer's? Not as credit for CTE. Then how is CTE to be dealt with in light of the fact that it's diagnosed in the disease? You could carve it out from the release. What symptoms? Are there other symptoms or other illnesses that could be? In our brief, well, no, it's not a question of other illnesses. There are symptoms, and in our brief we set forth there are four stages of CTE. Significantly, some of the most significant, one that appears in all four stages is suicidality, and we have the case of Junior Seau or Dave Dewarson, you know, people who in many respects did not exhibit suicide. Isn't that even more over-inclusive than Parkinson's, dementia, and Alzheimer's, insofar as there are many, many people that experience suicidal ideation who have never touched a football? There are, but there are also people that have Parkinson's, ALS, and Alzheimer's that never touched a football. And to the extent, again, we're not talking about, by the way, necessarily giving everybody $4 million. We're talking about finding some form of treatment, some form of compensation, frankly. That's really what we're talking about in exchange for the claims. The case law is pretty clear that these claims need to be colorable. They need to be colorable. They need not be something that's going to survive summary judgment. They don't even need to be something that, you know, is going to get through some type of extensive discovery. They need to be colorable. And the reason that they're colorable here is because they were the centerpiece of the complaint, and the NFL. The NFL has said as much by insisting that it be included in the release. If these claims were really worth nothing, then we wouldn't have to have them in the release. We wouldn't have to have the provision that that is the one disease that's not going to be addressed on these look backs that occur sometime afterwards. And, you know, it renders this settlement just on the distribution terms. Forget about whether or not there ought to be, you know, independent counsel appointed or not, but just on the distribution terms and what happened in the negotiation. But just on the distribution terms, it is unfair, and it should go back to the district court for that. Now, I want to note one thing. Just one thing on the fairness. Right. We apply a presumption of fairness, do we not, in reviewing a class settlement where you have arm's length negotiations, sufficient discovery, proponents are experienced. Everyone here is clearly very experienced in this similar litigation, and only a small fraction of the class objects. So there's this presumption. So how do you overcome that presumption? Well, I think that, again, at the end of the day, it's sort of solving for what all of those things are. What the GERS factors stand for, what the whole adequacy requirement stands for, is that absent class members are going to be treated fairly. Their rights are going to be protected. And they were protected in the settlement. G.M. Truck says, first thing you do, look at the distribution terms. In a situation where some part of the class gets significant relief and another part of the class gets no relief or very little relief, there's a problem. And here there's a problem because of, I mean, there was no discovery, for example. There was a lot of informal discovery. There was informal exchange of information, but no one was deposed. I think that where it happened, by the way, the fraud allegations here, which are the core of this case is the fraud allegations that the NFL lied to these players about the risk. It's not a question of whether or not there was a risk of having your head injured or brain injured as a result of playing football. The risk was concealed from them that if they went back into the game sooner or that multiple concussions would cause the problems that they did, and they sponsored junk science. But I think discovery would do that. I'm not advocating that we go back for that kind of discovery. Judge Brody dealt with an issue when we were before this court the last time, or I should say trying to get before this court the last time, to be more precise. We raised three issues. We raised, as principal conflicts, we raised the CTE issue. We raised the 75% reduction issue, which we're raising as well, too. And then the third issue we raised was the fact that the settlement excluded time for people who played in NFL Europe. And Judge Brody, following the fairness hearing, issued an opinion in which she said to the parties, you know, I kind of think the settlement would be a little bit more fair if we addressed this issue. And she addressed it. And that was a fundamental conflict and one that brought a lot of relief, probably brought over 2,000 players into the settlement. And, you know, it can be done. I think she's demonstrated a great ability to work with the parties and find a solution. I think what has to happen is the case needs to go back to Judge Brody and say, notwithstanding everything that you've done, notwithstanding all the great work that's occurred in this case, a solution needs to be found for the CTE issue. Now, we've advocated for that throughout. Not the deceased, only the living. You're okay with the compensation for the deceased? The compensation for the deceased is fine. We're not arguing that they're not. So she's got to compensate those living with CTE, and the way that will be diagnosed is if they die? It could be one way, but what she's got to do is provide, or what the settlement has to do more precisely, it's got to provide meaningful compensation in exchange for the release of the claims. Now, if they want to carve out the CTE claims, I guess that could make the settlement certainly, you know, more fair. We still have this one other issue, but I think you'd want that. You could have opted out beforehand. You could have opted out beforehand, right? You could have opted out, but opting out is not the answer, and that's not the right choice. The choice isn't either look at an unfair settlement that violates Rule 23 in due process or opt out. The option is to have a settlement that comports with due process, comports with Rule 23, and then either opt out or proceed your own way. What did Judge Brody say on pages 78 through 90 of her opinion that was off the mark with regard to why she wasn't, at this time, dealing with CTE? In terms of the 12, 13 pages of analysis as to why she disagrees with the points you're making today. So what Judge Brody got wrong was the adequacy of representation. She got wrong the, I mean, which is really, in the absence of a conflict of interest, I mean, those are the two fundamental points here from a purely class analysis. We dealt with the adequacy of representation at least so far. We said that latent brain injuries could include CTE. Well, but he doesn't allege that he, it doesn't say including CTE. In fact, it says just the opposite. It says dementia, Parkinson's, ALS, Alzheimer's leaves out CTE. It's called to his attention eight times. The biggest point, and it takes a long time to get scientific evidence. I mean, for example, Alzheimer's, she notes in footnote 53, I believe, there were some false starts there with regard to what people perceived, the medical community perceived, led to Alzheimer's. Were, you know, CTE has really been before us for what, since 06? In terms of. Arguably. I mean, and obviously it goes back much further. If you look at, they call it dementia pugilista. Is it. And all of that. But here's the problem, okay. We can account for that. We can account for the development of science. The problem is the release. I mean, we can debate how quickly we will have a definitive diagnosis. We can debate what is a definitive diagnosis. We can debate how you should compensate someone with a definitive diagnosis. But what we can't debate is that you have to, you have no, they have no right to demand or receive through this settlement a release of a claim that is at a minimum is colorable based on the evidence that was before the district court and by the admissions of the parties in the way that they structured the settlement. If this CTE claim is valueless because science is too ambiguous at this point in time, fine. Cut it out. Carve out the release. Don't put the release for CTE claims in the settlement. But instead, it's there. So that's the tradeoff. The tradeoff here is here's a class, and again, we can debate what the value of that is. But the question is, is it colorable? The answer is, it is. And for that reason, you know, this settlement is unfair based on the distribution terms, based on the adequacy of the representative and his counsel. And it ought to go back to judge Brody for more work and hopefully come to something that's fair. The final question that I have of you is that the settlement provides that at a certain interval that the parties can get together and, in good faith, possibly modify the uncapped fund here as to what it covers. Does that not address your issue if, for example, you say within five, six, seven years, you can diagnose CTE in individuals who are still alive? It doesn't as currently configured. Something like that might. All right. But currently, it leaves too much discretion to the NFL. To Judge Hardiman's point, it is monitored by the district court. But nonetheless, I think there's too much discretion left to the NFL, and it carves out CTE in a way that doesn't really render that meaningful. That kind of approach, Judge Abel, could be perfectly acceptable if done the right way. It's just a question of what it looks like. But right now, what it looks like is an unfair settlement, and it should be reversed. All right. Thank you very much. Thank you very much. Mr. Gupta. Thank you. May it please the Court. My name is Deepak Gupta for the Armstrong Objectors. I'd like to try to reserve two minutes for rebuttal. And I'm going to focus on adequacy of representation and, if I have time, the fee deferral issue. And I'd like to start with a question that you asked, Judge Ambrose, to my colleague, Mr. Molo, which was, is the problem here one of procedure or is it one of substance? And I think a central lesson of Georgine and of Amchem is that you can't take the two in isolation. And in many ways, the problem here really is Georgine and Amchem revisited. There, as here, there is a fundamental divergence in this class, a conflict between those who are presently injured and those whose concern is for future injuries. So you asked Judge Ambrose, what did Judge Brody get wrong in that section of her opinion? The first thing she got wrong is at Joint Appendix 92, where she said, quote, in this case, no fundamental conflicts exist. That conclusion is utterly at war with Georgine and Amchem. Because here your subclass one is players who are not yet diagnosed with a qualifying diagnosis. And subclass two is retired players who were diagnosed with a qualifying diagnosis. Other than a qualifying diagnosis not including CTE, what else should she have done? Okay. So that gets to the next step of the analysis is if there's a conflict, how do you cure it? But I think first what I'm saying is that she was wrong to say that there was no conflict. There very much is a conflict between future and present injury claims. Two questions in one, but why is that under Amchem or Ortiz or our case in Georgine from 96, why is that a conflict that is irreconcilable at this point? Well, it's a conflict under Georgine and Amchem because the interests of future and present injury claimants are divergent. As Justice Ginsburg said, what the future injury claimants want, if they had truly independent negotiation, a truly independent negotiator, that person would negotiate for the things Mr. Moeller mentioned, back-end opt-out rights, a deal that would keep pace with the science. And their interests are completely at odds with the present injury claimants who want a quick payout immediately. So I just don't think there's any way to reconcile that holding of hers with Georgine and Amchem. The next section that occurs in any, you know, the asbestos cases, any cases where there are a large futures class, right? Right. That's right. Should we not take cognizance of and perhaps put some weight on the fact that this is not a zero-sum game, the uncapped nature of this settlement? Doesn't that distinguish it from some of the other cases where the futures and present subclasses are at war over a finite pool of funds? It's always a zero-sum game, Your Honor, because the defendant always makes some kind of calculus about what their exposure is. And the question is not what's the size of the pie, but what are the allocated judgments within that pie. And there's no question when you have present injury claimants and future injury claimants that there's a tension there. It is impossible to reconcile. How can the allocation be as important as the pie? I'd rather get 20% of a million dollars than 100% of $10, right? Well, in a case where 72% of the class is getting nothing, and that's by class counsel's own estimates, you can see that at Joint Appendix 1585, 72% of this class gets nothing. So the vast majority of the compensation goes to people who are present injury claimants. 72% of the class is getting nothing. That means 72% of the class does not get diagnosed with a qualifying diagnosis, correct? That's exactly right, Your Honor. Which is actually something probably good for the NFL, is that you've got 72% of the people who play, even those who play for a long time, may not have a qualifying diagnosis. But the problem is that the qualifying diagnosis framework excludes the telltale signs of CTE. It excludes the mood disorders. It excludes the depression. It excludes the stuff of CTE. And instead on that grid are conditions like ALS. ALS is a condition that they estimate only about 30 people have. But coincidentally, or not so coincidentally, the present injury subclass representative is among those people who is at the top of the grid. So the problem here is that that qualifying diagnosis framework was arrived at before the mechanism was put in place that's supposed to paper over the top. So what other qualifying diagnoses should be included apart from CTE? Well, I think my point is not a freestanding fairness attack on the settlement, right? What I'm showing is that you have to consider procedures. You just argued, unless I misheard you, that the scope of the qualifying diagnoses is inadequate. And I mentioned CTE, and we're all well aware of the controversy regarding CTE. I'm asking is there anything else besides CTE that should be a qualifying diagnosis? My point, Judge Hardiman, is that if there were truly independent representatives for the future injuries, CTE, people concerned about the risk of CTE, I think they would negotiate for compensation for the conditions that are associated uniquely with CTE, like depression, like mood disorders. Those things aren't on the grid. And strangely, even though this litigation was brought up. As Judge Hardiman noted and as Judge Brody noted, that depressions and mood issues affect the whole population, football players, non-football players. Well, they are of higher prevalence in the population, but that doesn't mean that you settle a case about CTE and end up with a settlement that by the settling party's own admission doesn't compensate for CTE. It omits CTE. So now the settlement's going to be watered down by, you know, every field goal kicker who's depressed is going to be part of the settlement now? Isn't that going to do great harm to the folks that are part of the class that have really awful brain injuries? I don't know what's going to happen, Judge Hardiman. What I'm suggesting is that you have to comply with Georgian NAMCAM. You've got to have a negotiation structure that provides for some independent representation for those future injury claimants, and that didn't happen here. The subclass structure was devised after the qualifying diagnosis. Judge Hardiman, by the way, you sound like Bill Parcells with regard to field goal kickers. I'm not really against them. I checked a little myself. One time there was a field goal kicker. They were asking about an injury problem with a field goal kicker, and he says, you know, there's 1,586 players in the NFL. Who cares about a kicker? Right. I mean, if it were offensive linemen, though, I mean, that's really the problem, right? There are people who play in the field. So maybe we would give them classes then that the offensive linemen that are, you know, 12-year veterans, 12-year starters, if they're depressed, they're part of the class, but the guy that only played a short time or was a bench player or a kicker or punter, they're not part of the class? I mean, how do you do that? That's not what I'm suggesting. If you take a look at the public citizen amicus brief, they show how the conflicts may run more rampant than the conflict we've identified. The conflict we're talking about is just the really big conflict at the heart of this class. It's pretty hard to deny between present and future injury claimants. And I want to suggest a framework for you in thinking about this case, because I do think you really have to consider procedure and substance in tandem. Luckily, we're in the Third Circuit, and we have the best and most thoughtful opinion that's ever been written about this subject, and that is Judge Becker's decision in Georgene. And if you take that decision, you take some of what Judge Becker said in GM Trucks, you have a framework. It is not the Birch factors. It is a framework designed to look at adequacy of representation. So let me suggest some questions to ask. I'm still trying to figure out what your amchem problem is. Future injury plaintiffs want protection against inflation, back-end off-bounds, keep pace with science, and present injury plaintiffs may wish to trade those away. Right, exactly. Does that really occur here? Well, the point is that conflict exists within this class. But what tells me that there is a harm from that perceived conflict? Well, I think the stark disparity at the heart of this settlement. I mean, if you die with CTE the day before final approval, you get up to $4 million. If the day after final approval you die with precisely the same condition, you're identically situated, you get far less. Although 89% of those, at least based on at least one affidavit, are at least covered by a qualifying diagnosis, correct? There's going to be some overlap. But if you look at the average CTE payment, and this is class counsel's own estimates at Appendix 1573, the average CTE payment is going to be $1.44 million. The average dementia payment is $190,000 by their own estimates. So one is not a proxy for the other. There's a radical disparity at the heart of this settlement, and it's a disparity that's explained. It's by the conflict of interest in the class. The line is precisely the same. And so I'm not saying that that automatically results in reversal of the settlement, but it should be a red flag. And then I think you can ask other questions like, have major causes of actions or claims been omitted from this settlement? And class counsel, I think, if they're consistent with their brief, is going to have to get up here and say, this settlement does not compensate for CTE. That should be a red flag because I thought this whole litigation was about CTE in the first place. And then if you follow Judge Becker's logic, you can ask, did the parties achieve settlement after little or no discovery? The answer is yes. They didn't even go after the memos within the NFL's headquarters about what they knew and when about the risk of CTE. And then you can ask, is the settlement accompanied by the likelihood of an enormous legal fee? The answer is yes here. $113 million in legal fees for a class where 72% of the class gets nothing, and they don't even have to bother to present their fee application to the court, which I've looked. I cannot find a court of appeals decision anywhere that permits that kind of procedure. The Seventh Circuit, Judge Posner has said that. The $112.5 million is on top of the uncapped fund, correct? That's right. It's on top of the uncapped fund. And it's coming out of the NFL's pocket. That's right. But why does that save it? I mean, I agree with you. It seems rather idiosyncratic, but why doesn't that segregation save it? Judge Parderman, that's exactly the logic that this court rejected in GM Trucks, because I think it's bad economics, because the defendant knows they're going to have to pay a chunk of change, and that's all they care about. They don't care how it's allocated between attorney's fees or between reliefs to the class. And so if you're assessing the adequacy of representation, you're assessing the fairness of the settlement, you've got to know how much are class counsel getting and what did they do to earn that money. So if we remand it with instructions that the settlement change from $760 to $872, then it's okay? No, no, Judge Hardman, because I think the fee is an integral term of the settlement. It's what class counsel was negotiating for. We need to understand, to assess adequacy of representation, how much time did they spend on this case? Did they have any conflicts of interest that would be revealed by side deals? How much are they getting in contingency fees on the side for representing individual clients? We don't know any of those things because there was no fee application filed. And I think you should also be concerned about the prospective effect. If you become the first court of appeals, Third Circuit becomes the first court of appeals to allow this unusual fee deferral procedure, not only would you be in conflict with the Seventh Circuit, but that's a green light to every plaintiff's lawyer and every future settlement. Let's make the settlement a fait accompli. There will be no scrutiny of our fees, and we'll file the fee application in due course at some point later. You also disable court scrutiny of the fees because no one's going to have an incentive to object to that fee application later on after the settlement is done. And that means nobody's going to appeal, which means this court isn't going to get a crap at assessing those fees. That is a class-action governance problem that this settlement structure invites, and it's an independent basis for reversal. But I think it's also not just an independent basis for reversal, but it also highlights the inadequacy of representation here. You can't properly assess the adequacy of class counsel's representation without getting the crucial information that you would get in the fee application. What did they do? We know they didn't do any discovery. Did they do anything other than oppose a motion to dismiss and then head straight to the negotiation table? What were they not well-informed about taking the language from GM Trucks? You haven't told me yet what you would want to discover. Why were they not well-informed? What information were they lacking under GM Trucks? I think at a minimum we'd want to know what internal memoranda did the NFL have about the risks of CTE? What did they know, and when did they know it? I think those are the central questions in the case. And so I think at a minimum it raises a red flag when you go straight to the negotiation table. I'm not saying that's a per se rule. You can have good settlements that result with informal exchange of information and no discovery. I'm simply saying that's one red flag. It almost sounds as if what you and Mr. Molo are arguing is the perfect is the enemy of the good. This was a settlement I think probably most people perceived at the outset would be very good, highly unlikely, and yet it's occurred. So that would seem to say that class counsel at the very least has done a very good job in negotiating. Has done a very good job? Well, I think the question isn't whether they should be, you know, whether they achieved something by getting a deal. The question is at whose expense. And the problem is here you have a big red line running through the class between present and future agreements. Because what you're saying, because we don't have the science today with regard to CTE, that this settlement should just be kicked back six, seven years. No, I'm not suggesting that. And, look, I'm not going to play God here. I think part of the problem with this settlement is that the class counsel played God. But Justice Ginsburg in AmCan talks about this. Judge Becker talked about it in Georgene. This is like the asbestos situation. The science keeps on changing. And so if I were an independent representative just for the future claimants, I would take that into account. You asked Judge Ambrose about the mechanism that this settlement has where the parties are going to meet later on and figure out how to change it. I think something like that would be a good idea. If I were negotiating for the future claimants vote, I'd want there to be some teeth. The problem with that provision is it gives the NFL a unilateral veto. They can do whatever they want. So if they think it's good PR. They're negotiating in good faith, and I suppose you could go back into court and say they're not acting in good faith. That's not much to work with. I mean, as long as they sit down at the table and talk to you, I think you'd be able to say. It depends what the evidence would be, and that's the next case. Right, but the point is it's this case. Because what the Supreme Court said in AmCamp is that if you have truly independent representation for the future claimants, they're going to negotiate with that in mind. Instead, you have a settlement here that freezes the science in place. And you have a subclass structure that was devised after the critical decisions were made about qualifying diagnoses. So you had a future – the future subclass counsel is utterly inadequate. He's picked after the structure is devised. He's picked not by the court, but he's drawn from within the ranks of the conflicted plaintiff's steering committee. So he's not independent of that committee. He's drawn from it. He has the same incentives as the committee. He reports to them, presumably can be removed by them. And finally, there's the conflict of interest that we've identified. If you look at the complaints attached to our judicial notice motion, the future subclass counsel actually represented present injury claimants. What, two of them? A few, yeah. It's in a few complaints, but the point is that he had a contingency interest in those representations and, in fact, shared a client with the present injury subclass counsel. So – and the harm that exists from that conflict, purported conflict of interest, is what? Well, I think that's what – I mean, that's what these cases, Georgina and Emkin, are all about. You've got to have someone who's unconflicted, who's truly looking out only for the best interest of the future. Talk about what the possible conflicts would be that have been noted, and I'm not sure that I understand how those conflicts have resulted in the harms that have been noted in those cases, at least here. I mean, I think, you know, you have to – if you don't buy that there's a basic disparity in the settlement, then I think I'm in trouble. I think you have to see that there's a basic disparity in the way that CTE is treated and its conditions. I hope that – I hope we've shown you – at least given you some reason to be concerned about that. And then I think you have to look at the negotiation structure, and I think this is not a negotiation structure that's – it's not anything other than a mere gesture. After the deal is really hashed out, the class counsel recognize that they have a problem. Despite what Judge Modi said, that there's no fundamental conflict of interest, they recognize. They knew enough to know that they had an Emkin problem, and they devised this subclass structure after the fact. But they picked people from within their own ranks, within their own conflicted group, to serve in those roles. And that's just – if that's enough to comply with Emkin and Georgine, it reduces those opinions to not very much. What we really need is truly independent counsel. I have faith that if this court – I'm sure this court is concerned what happens – you know, what happens if we reverse and we send this back down? Is this going to throw the whole thing out? And I'm concerned about that, too. We wouldn't be up here arguing, making these arguments, if we felt we would just blow the whole thing up. You're just anticipating my last question. Yeah. Okay, so let me try to – do you want to answer it? No. No, I mean – You can say I'm not. None of us can say – you know, none of us can look into the future and we don't have a crystal ball. Judge Becker talks about this in his opinion. I mean, at a certain point, you do have to do the law, and there has to be – you know, you have to have a structure that complies with the law. But I also think you should feel good that there – and optimistic that a deal can be done. If class counsel's only argument is that there was independent representation here, then they shouldn't have any concerns that when this goes back down and it's done the right way and the T's are crossed and the I's are dotted and there's a fee application and there is proper independent representation that they'll get something that looks fair. And if they're so concerned that that can't happen, then there's something wrong here. And that means this deal that's before you is the product of an inadequate structure. Thank you very much. Mr. Bashman. Good morning, Your Honors. May it please the Court, Howard Bashman representing former NFL offensive lineman Craig Heimberger and his wife. Welcome. Before this Court can uphold this settlement, this Court must make sure that the requirements of Rule 23 are satisfied. And I'm here to argue this morning that the most fundamental defect that this case presents is that it cannot satisfy the predominance prong. It's argued in class counsel's brief that that's just being half-heartedly urged on this Court. Well, I'm here to wholeheartedly urge that on this Court this morning. In fact, on page 16 of our brief, we cite a passage from Amcan, and we argue that that passage, which demonstrated why that case did not satisfy the predominance prong, applies equally, if not more so, to this case. In fact, these people were injured. So it doesn't meet the predominance prong because? I was just about to touch on that. Because these people were injured in vastly different ways over vastly different time periods to different extents. The claims we heard one of my co-counsel on the objector side argue involves principally a fraud claim. And class counsel cites the prudential case as saying, well, fraud claims can be certified. But a more recent case from this Court, the Malak v. BDO-Seidman case that Judge Smith issued for the unanimous panel in 2010, recognized that in cases where reliance is important, fraud class claims cannot be certified. And, indeed, that is generally the law throughout most of the circuits. This is a personal injury case. It's different from asbestos. It's different from drug exposure. In fact, if you look at the class definition, it's unclear to me even what time periods are involved because it says all retired NFL players. This is a class that spans years and years. I thought Judge Brody decided or found that the class of retired players was, quote, far more cohesive, close quote, than the sprawling Amcam class. Well, the cohesion issue is just one consideration in determining predominance. But as we heard this morning with regard to the place kickers, and I guess there was a place kicker who had an op-ed yesterday in the Philadelphia Enquirer, those people have much different concerns than my client who was an offensive lineman. But to just finish the point that I had started into, there were evolutions in technology over the period of time that's covered here. There's evolutions in scientific knowledge. The manner of injury, as I said earlier, was unique. And at the end of the presentation. How does that defeat V3? How does that defeat the predominance under V3? Because as to each individual NFL player, the extent to which these supposed representations were made in his reliance upon them are going to be different. And, in fact, the representations are not what injure the player. The representations, assuming that's correct, gets the player back on the field. And then whatever happens after that is precisely what's unique. And it is what happens after that that is giving rise to these injuries, not the representation of themselves. But retired players, they all know they played in the NFL. They were injured in a discreet way by a single defendant, they allege, perpetrating a common scheme of alleged fraud and negligence, correct? Well, I mean, we take issue with every one of those points. I'm not going to say correct, but that is what class counsels argue. Well, that's also what the district court found. The district court found that these were all NFL players and that they were injured as a result of being NFL players. I acknowledge that, yes. In certain ways, certain qualifying diagnoses ways, one of which CTE, as we've been talking about for some time. So you're suggesting that we have a remand because 23V3 is not met? Well, unlike Mr. Gupta, who said he doesn't want to explode the settlement, my clients perceive that he does better without having any class action. So it's my argument to you just so that there's no doubt. And he didn't set out to help? Correct. He would have been worse off, he would have been marginalized if he had opted out and the settlement went forward. What does that mean when you mean marginalized? That the value of his – Isn't that a fair hearing in court? What I'm saying is the value of his case is better if there's no settlement than if he had opted out and the settlement goes through. Why? If he opts out and has his day in court, the sky's the limit. He'll get whatever damages he proves up, would he not? The answer to that question is that the number of people that were pursuing these cases before the class action was brought were a distinct group of folks who had counsel, and my client was one of those. And so I think that as we perceive it, as his counsel and the client himself, it's not the same if there were individual cases being pursued even through the MDL, which of course is a way that you can coordinate pretrial proceedings. It sounds like a roundabout way of saying you'd be able to get a much better settlement if the NFL was getting sued in thousands of cases rather than having to litigate a small number of cases. Is that your point? Right. And I don't think there's anything wrong with coming in here and saying that because that's my client's interest. Okay. Thank you, Your Honor. Thank you very much. Mr. O'Brien. Good morning, Your Honors. Colin O'Brien on behalf of the Gilchrist Estate. Our brief argues that we need to put the science on trial. One of the core allegations in this case is that the NFL promoted junk science, and we argue that the way that the district court approached the science didn't correct that problem. Well, you're saying there should have been a dauber hearing? Many. Yes, Your Honor. We need to put the science on trial in the light. The dauber analysis under the blood reagents case that this court handed down this year says that when a plaintiff tries to prove cluster elements with expert testimony and it's challenged, the trial court has to find that that testimony meets the rigors of dauber. We just heard Mr. Lolo say, especially with respect to the CTE. I've read the district court dealt with that on page, what, 44 of her opinion? Footnote 37. Yeah. I don't have to do it because it's objectors that are challenging it. And, Your Honor, I would respectfully suggest that AMCAM requires differently. We had a dispute. Mr. Lolo was saying there was a dispute about CTE, whether it can be diagnosed in blind people. There was a dispute about that. We shouldn't be using deductive logic about the science. We should have rigorous analysis of these scientific propositions. We had untested declarations. You heard we had no discovery, and we don't even know what was going on in terms of how the experts were helping. I mean, there's a lot of testimony or I guess. What would be the primary untested declaration that you would like to challenge with a dauber hearing? I would say all of them. I say. The primary, I think, asked which one is the top of your list. The primary is the ones that rely upon the suggestion that CTE is not diagnosable in live people, as well as excluding mood disorders. Because the way I listen to the arguments here, everything revolves around science, and I think we have a meta problem. We're using deductive logic about science, about fair and disfair, and, you know, what about the kicker and the kicker's not hurt, and what mood disorders aren't. Isn't that in the general population? Those are all science questions that should not be left to deductive logic. We have a process for that. It's called dauber. The court should sit down live witnesses, go through the reliability analysis. We should be cross-examining those live witnesses, and we may not have some of these problems as to whether it's fair or not. If the judge makes conclusions about reliability about the science, the state of the science, maybe some of these fairness issues go away. That's the point where we'd like your honors to remand so that we have rigorous analysis about the science. And I want to stress again, the reason why we have this case is because there was a defect in the science. We had the NFL promoting junk science, and I would ask your honors to question whether we are much better off in this settlement looking at untested declarations, no discovery, no cross-examination. So let's say we agree with you. What happens? We go back down. We get the types of witnesses that the objectors were asking to have at the final approval hearing. I would actually ask for discovery in advance of an approval hearing, discovery about the witnesses that the NFL and the players promoting the settlement want to put on. Here's our three witnesses on why mood disorders are just in the general population, and they're not sufficient indicia of CTE. Here's our witnesses for why CTE can't be diagnosed in live people. We get our own witnesses, and we have a true battle of the experts. And then based on that, Judge Brody can determine whether or not. Based on this true battle of the experts, what do you anticipate the outcome would be that's significantly different than what we have today? Well, you're asking me? I think we're going to find out that you can diagnose CTE in live people, and I think that we're going to find out that it's reliable to say that mood disorders should be compensated. We have repetitive head trauma. I don't know. What evidence do you currently have that you can diagnose today CTE in live people? Dr. Stern says five to ten years away. I think all the other doctors I've seen, at least in this record, say it's in the future. It's coming. It's not here yet. Well, I guess I got trapped by that because I would say we need the science to be able to answer that question. I thought you were asking me personally. That's part of the problem. Mr. Molo, in the weeks before the final approval hearing, had a list of witnesses on this issue. He wanted to submit some witnesses on this exact issue for the final approval hearing. He had two doctors. Their names were Dr. Stern and Dr. Gardy. This is Robert Stern? Yes. Again, he was on TV just 60 minutes this Sunday saying it's about five to ten years away. He's on TV, but is he on the witness stand? Do we have a record? I don't think he's going to say anything a whole heck of a lot different, is he? I think we owe it to these players whose lives are at stake in this case to at least have the man sit on the witness stand. Okay. All right. Thank you very much. Thank you. I'd like to reserve time for a rebuttal of Robert's race. Okay. Thank you. Thank you. Rebecca? You're not going to talk about Georgina, are you? No. No, but I would point out that's a wonderful portrait. That happens to have been painted by Mr. Lankford, who is in the room and is one of the lawyers for class council. A lot of pages have been written. The one that captures him, by the way, is the one at Yale. I'm sorry? The lounge at Yale is the one that captures, I think, your father the best. I agree with that. That is a beautiful portrait as well. A lot of pages have been written on the Gersh factors and the prudential factors that guide an assessment of whether the settlement is fair and reasonable. At this juncture, I don't think it would be productive to try to review all of them, but what I would say very simply is that through that entire analysis, there is, I think, a penetrating truth that endures, which is that 72 percent of this class is going to get nothing out of this settlement, not less than you'd want, not just a little bit, but actually nothing in exchange for the release. As I asked before, if 72 percent so far gets nothing, that might be a good sign for those 72 percent. Well, that would only be a good sign, Judge, if it then follows that they didn't have injury. Correct. And the problem here is that, as Mr. Mollo made clear over time. So maybe 72 percent five years from now becomes 42 percent. We don't know what's going to happen to the folks in the ensuing years, and the settlement does have a vehicle for that. Well, but a limited one and one over which the NFL has a significant veto power. And I recognize that there are science issues that have been discussed. There are causation issues. There are legal defenses that have been asserted that might result in some of these claims or many of these claims if those defenses are successful entering into an arbitration process, which has its own set of issues. But at the end of the day, all of that, those are complicating factors and may well argue in favor of people with CTE getting less. But it doesn't argue in favor of them getting nothing. And I would point out that there is a direct correlation between this substantive problem and the adequacy, the procedural adequacy issues that have been identified and stressed by Mr. Mollo and Mr. Gupta. And at the end of the day, I take seriously the observation that I believe was made in the class council brief, that a good process leads to a good result. A good process leads to good results. Under the GERSH factors and the prudential factors, we can observe that there is a profound unfairness that lies at the heart of this settlement. And that unfairness is the product of something deep. So in that sense, the GERSH factors, I think, can be viewed as a kind of cost check against the adequacy issues that you have read about and has been argued to you. Let me come back to Judge Hardiman's question. If you have subclass one people not yet diagnosed, that 72% conceivably could become in the next number of years 42%. So isn't that a way, a fair way to deal with it? What else would you do? Well, I would turn this back and I would force the class council to get back to work. We would cure the adequacy issues. We would give everybody the vitamin of independence. And we would get them back in front of Judge Brody and get everyone back to work and find a better construct. What would be a better construct? A better construct would be one, and Mr. Mollo has identified some options. It could be back-end opt-outs. It could be a more rigorous approach to development in science. But there needs to be an approach that provides a more sturdy construct for monitoring and compensation of the 15,000 retirees who currently are going to get nothing by class council. If one of the 15,000 in the next few years becomes diagnosed with one of the qualifying diagnoses, is that person not covered? Well, that person is covered by their CHURA. They're having a qualifying diagnosis, but they're not covered by their CHURA. They're having CTE. And if there's one thing that has come out. And that conceivably may change once the science becomes more solidified. That may change. That may change. But right now, and yes, it's true that the settlement does provide for a periodic meeting. I think it's every 10 years. The class and the NFL would go together. But at the end of the day, the NFL holds a veto power as to what becomes a qualifying diagnosis. That veto power represents a stranglehold on the ability of the 15,000 people who currently will get nothing, and yet will have debilitating or may have debilitating injury from receiving compensation under this class. These are all solvable problems. And what I urge and what I believe many of you are urging is that we send this back, get everyone back to work, and find a better solution for that issue. All right. Thank you very much. Thank you. We'll hear from Mr. Isikoff. Thank you. Thank you, Judge Amber. And may it please the Court, Samuel Isikoff for the class counsel and class plaintiffs. I will be dividing the- Can I once again put the emphasis on the long syllable? I did it again. I'm sorry. We've done this before, Judge Amber, and we'll keep working on it. In 10 years, I'll get it right. Thank you. I will be dividing the issues with Mr. Clement. He will be addressing primarily the Gersh factors and the fairness of the settlement, although I may touch on some of that. And I will be addressing the challenges to the class certification and the adequacy of counsel and the representative parties. I want to make three basic points. First, I want to discuss the settlement and what it provides for the class. Second, I want to correct the record on the question of CTE and particularly Sean Wooden's allegations and his complaint. And third, I want to address the mischaracterizations of this court's history on the award of attorney's fees in ongoing complex mass tort settlements. So, if that pleases the Court, I will proceed in that order. There's a fundamental misunderstanding about what this settlement does. This settlement is designed to do two things. First of all, it's designed to compensate neurological and cognitive deficits caused by football. And second, it's designed to compensate that in the living for people who have these disorders and whose lives are compromised as a result. This is not a settlement that purports to treat every underlying manifestation of a life spent playing football. It is not a settlement which purports to cover the waterfront of any possible consequence that may come from that. It is designed to get at those diagnoses, those conditions that have been established by the science of today as being causally related to football. And these are all epidemiological claims. These are all claims that say you have a heightened risk of ALS, you have a heightened risk of Parkinson's, and we will compensate you if you get Parkinson's or if you get ALS because we understand that in some provable way, that condition may be linked to football or at least may be linked across the spectrum of people who get those diseases. Now, what that means is that this settlement is largely an insurance policy for every single class member that says, if you should be befallen by one of these conditions, your lives will be materially improved. You will get the assistance needed. Our lead class representative on the presently diagnosed Kevin Turner is in desperate condition with ALS. All his life functions have been compromised. This settlement would put $5 million in his hand. He does not have the ability to withstand the financial pressures right now of his disease. What this settlement is not designed to do is to compensate anything that might be thought to be related to NFL play. If we did that, and we could, we could have said any NFL play. It obviously doesn't relate to ACL tears. It doesn't relate to ACL tears. What confidence can we have in the absence of the kind of scientific testing that Mr. O'Brien was advocating for, that these diagnoses, these qualifying diagnoses, adequately cover the field for all of the concussion-related injuries that a player might have suffered? We cannot say that we will never know that something will be different. None of us here can predict into the future in that fashion. What we can say is that this is an unusual class action. In fact, it's a unique class action because a quarter of the class had already filed suit at the time that the settlement took place, and that quarter of the class was making a claim for what could be proven at this moment. Now, it is true that science could change, and there is some need and confer language in the settlement. I don't want to put too much weight on that because this is a settlement that offers right now the following. We will give you an immediate battery of medical tests. If those medical tests show that there is something that needs to be treated, we will assist you with the medical care. We will assist you with the pharmaceuticals that you will need for that. That's here and now, and we will offer you a guarantee that if something comes in the future, then you will be compensated for these conditions, which are the most serious that are associated at this time with playing football. That's what the settlement is designed to do. Now, this court has previously recognized that when there is a fundamental interest in the ongoing processes, that this takes away the conflict, and I want to say that there's three basic reasons that the conflict is taken away here. First of all, as has been discussed, we had subclass representatives, but we had more than subclass representatives here. With 5,200 people having filed suit, by our analysis, 4,900 of those are not symptomatic at this point. 4,900 out of 5,200, roughly, do not have a qualifying disease at this point. They are represented by 300 sets of lawyers. So you had more subclass counsel, as it were, more subclass representatives reviewing the settlement, and of those people, all but 80 chose to stay in the settlement. All of them have voted for those who opted out. Do you have any information about the principal reasons as to why they opted out? Yes, it all turns on their lawyers, quite frankly, Judge Ambrose. I didn't want to say that. And the reason that if you opt out, but to go to the opt-out point, on a legal basis, in the diet drugs litigation, quite frankly, nobody mentions it. Nobody mentions it. It's like a one-off case. 43 times that case came before this court. Every judge on this panel has sat on at least one diet drug case. Oh, well, I know. Yes, Judge Ambrose, you've set the record for diet drug cases. But the opt-out is meaningful here, and that's what sets us apart from the Georgene Amkamp type case. In Amkamp, the class included everybody in this room, everybody born before 1993, whose parent may have been exposed in an office or anyplace else to asbestos. That's everybody. I was a class member. I had no idea. That's the kind of class that you were dealing with in Amkamp. In GM trucks, this court said, these are people who have small coupon values, who have no incentive to try to protect their claims. In this case, the fact that a quarter of the class has opted out is an indication of the unique quality of this class action. This is the most cohesive, informed set. A quarter of the class had filed suit. Only one percent, I think, is too much. I almost lost the whole case right there. The reality is that a quarter had filed suit, which meant they had made an affirmative choice that the legal system on an individual or a couple of cases filed together was a viable option for them. That has never happened before. We've never seen that. We have at this point, this is not on the record because it's an ongoing figure, but 7,500 class members have already tried to enroll in some fashion into the settlement process, even though it's not open. This is a participatory settlement of a kind that we've never seen. A lot of the focus in cases like Amkamp on the need for strict rules on subclass representation and the like is because there's no reason that a class member would actually protect his or her rights or his rights in this case. One of the questions is with regard to subclass counsel. I understand that they were picked from the steering committee while negotiations were ongoing. Why not go to the district court and ask the court to pick someone from the outside? Well, Your Honor, to pick somebody from the outside would mean that we would move outside the expertise of who the district court had chosen as the plaintiff's steering committee. There was an application process to be part of the plaintiff's steering committee, and the district court chose the people that she thought were the most capable, the most informed, the most likely to prosecute this case successfully. To go outside that means to, quite frankly, water down the quality of representation beyond what the district court had found. The objectors claim that Mr. Wooden doesn't adequately represent a certain group's interest because he doesn't have CTE. What's your response to that? Because he didn't allege CTE, they say. That's just a flat misrepresentation of the record, unfortunately. If one goes back in the record to the district court complaint that Mr. Wooden filed in his individual capacity in the Southern District of Florida in 2012, 2010, I think, that complaint alleges CTE 13 different times. There's an entire subsection of that complaint called CTE. One of the prayers for relief in that complaint is a request for medical monitoring specifically to address the problem of CTE risk. In addition, in the district court, once the cases were transferred by the NBL panel to Judge Brody's court, Mr. Wooden filed a renewed complaint, this time as class representative. In that complaint, it copies verbatim what he had alleged in the Southern District of Florida, and so 13 times, again, he makes the CTE allegations, and 13 times those are linked to a prayer for relief for CTE monitoring. Right, but I think their answer, they can correct me if I'm wrong, but I think their response to those facts you just cited is that he's giving away the farm because he's not getting anything for CTE, right? Mr. Wooden, no, we have no way of knowing whether Mr. Wooden has CTE. So we keep getting back to this first principle of whether or not CTE can be diagnosed in the living. Yes, and the problem is... Why is there not a factual dispute on that? Why is there not a factual dispute? Because the medical evidence is uniform on this question. The scientific, if you go to any peer-reviewed journal, there's nothing in the literature, there's nothing in any of the experts propounded by anybody in the court below, not by the NFL, not by us, not by the objectors, that challenges that very proposition. Well, I think you can see that five years from now the inverse might be true. It might be true. So then what happens? Let's assume that five years from now all that literature flips and says, you know what, we can diagnose CTE in the living, and there's a very medically determinable test to do that. Then what happens to the folks that are part of the class now? If the diagnosis of CTE is linked scientifically to any of the qualifying diseases, then the parties will have an obligation to meet and conclude. What if it's not linked to a qualifying disease, but it's directly tied to repeated blows to the head that are found commonly in NFL football? Well, then we have the other parts of the case that people have to understand in any settlement. Any settlement is against the background of risk. Every single case that had gone forward, and no objector wants to talk about this, every single case that had gone forward had already lost on the labor preemption grounds. Even if CTE is linked to football, then how does that establish it's linked to NFL football? If you go to the only settlement. But that's an argument to have no settlement. That's an argument on the merits that you win and, you know, we're not entitled to any recovery for any injury. Well, I don't win on that. My class loses entirely on that. Well, yeah, I guess. For the NFL. But that's the point, Judge Hardiman, that we would lose entirely. And so here's where the science is. If you look at the McKee study, which is the only one that has actually examined the 91 brains that have been used so far, a quarter of them who also tested positive had never played in the NFL. Six or eight of them had been high school students who had died and had CT on the brain. So it may very well be that early life contact is what causes the CT accumulation. We don't know. It's also possible that the advance of the science will be like the advance of Alzheimer's, as reflected in footnote 53 of the district court's opinion. It may turn out that the advance of science shows that ALS is not related to CT, is not related to football. We could have any number of advances in science. One makes an educated guess in any litigation. If any single player of these 5,200 who had filed suit had gone forward in their trials, any one of them would face this question. And if they were offered an individual settlement, then they would have to address the question of whether or not this was an adequate settlement, given the risks, given the future developments. This happens in every car accident case. I'm injured today. It may turn out that my back will deteriorate in five years, and I have to accept a settlement today or not. And these settlements are not kept open on the grounds that, well, there may be better MRIs in five years that can detect some kind of latent condition that right now hasn't manifested itself. One of, if not, this is on the second issue you wanted to speak about, and to some extent talking about it now, CTE. You die on April 21st of this year, and you're diagnosed with CTE, and you can get an award up to $4 million. If you die on April 23, you don't. That's correct. And their argument is that that's unfair. And your response to that is? Well, there's several responses. First, there is a line drawing question, as the court indicated right at the very beginning. So some date is going to be a trigger date if this structure is put in place. The main argument is that this is a case about trying to compensate the living. It's trying to compensate those while they are alive who have the disease. Now, we have a problem in the settlement, which is that there is a small number of people who died before the effective date of the settlement, who could not get the kind of medical diagnoses that are necessary, and for whom we have some reason to suspect that the quality of their life was compromised by their exposure to football along the lines of one of the qualifying conditions. So for a group of about 50 or 60 people, a humanitarian exception was made. And that's what it was. It was an extraordinary additional benefit. The benefits, as the district court found, were calibrated so that they didn't. It covered people like Mr. Mackey, or who did that cover? People like Mr. Mackey? Yes. It covered people who died in the period after the start date of the class, which is 2007, and who died before the settlement was approved, which is individuals who were never on notice that they should get the kind of baseline examination that the settlement provides to every single class member that couldn't get the treatments that the settlement will facilitate for class members. None of that was available to those individuals. And so we made an approximation. And what the court found was that the individual awards that followed from death with CTE to these 50 or 60 people are roughly what they likely would have gotten under the terms of the settlement had they been able to prove up their medical conditions. But, Judge Amber, I think that the critical point, which I want to stress again, is that if they die after the settlement goes into effect and they have none of the qualifying conditions, and it turns out that they have a pathology that caused their brain to have this tau protein, all the best to them. They lived a good life. It is also true that Alzheimer's can still to this day only be conclusively diagnosed upon death. But we have enough scientific evidence to say these conditions are so correlated, found in conjunction, so correlated with Alzheimer's that when they exist, we think that there's Alzheimer's. And that's what this settlement is compensating. It turns out that if you do an autopsy post-mortem on somebody and you find Alzheimer's, but you didn't find any signs of dementia during their lives, which is they were lucky, they don't get compensated here either. So that's, in effect, the answer to the claim that, hey, 11% may have CTE and 89% of the group of 100 were diagnosed with a qualified diagnosis, 11% weren't. You're saying that's good for them because they didn't have the symptoms that would have qualified for the disease. It's a bizarre day when I have to stand up here and say that you had the malfortune of not having ALS. This is a ridiculous argument. You lived your life in a healthy fashion. You didn't have dementia, you didn't have Parkinson's, you didn't have ALS. Those are the conditions that are being compensated here. And if you don't get them, all to the better. That was the same as the settlement that this court approved. Well, they're saying, yeah, but I had CTE in your answer as well. Nobody could have known that definitively because the science hasn't caught up. And even if you did, if you did not have a compromise of your life functions, then you don't get compensated under the settlement. This is just like the diagnosis. Because there's no evidence that the buildup of the tau protein compromises one's activities. There's no scientific evidence of that at all, unless it has manifested in some condition that we are going to compensate here. Again, the district court said, and none of the objectors have addressed this, that she based the record here on the diet drugs record. She tried to model this after the diet drugs settlement, and she approved it in light of this court's repeated endorsements of diet drugs. In diet drugs, there was valve compromise in every single person who took this medication. Some of it rose to a compensable level. Some of it did not. Some people lived out their whole lives and never had heart trouble that compromised their life functions. Some did, and they were compensated, and they were compensated generously under the terms of the settlement. For those who had an assault upon their cardiac functions as a result of the drug, but who nonetheless were able to live out their lives in normal fashion, Godspeed. This is just a good thing, but you had an insurance policy. You had medical testing provided for you by the settlement. That's exactly what was done here in order to provide these people with a measure of security. Again, they have the ability to opt out. These are viable individual lawsuits, so they claim, although, oddly, Mr. Molo has no cases on file. That's a question of how he stands up to make a demand upon the settlement when he has never even initiated litigation on behalf of anybody. I think the third point you were going to address is what the attorney sees. Yes. There's a claim made now that there's fundamental legal error because there was a divide between the merits determination on the settlement and the attorney's fees, which were subsequent. Mr. Gupta gets up and says there's no court case that has ever approved anything like this. That's just not true. The district court said that she's relying upon this court's decision in Diet Drugs in 2009 for exactly this kind of settlement. In Diet Drugs, the settlement was entered into in 1999-2000. It was approved in 2000. The attorney's fees protocol was not put into place until 2001. The fee awards were not made until 2007. This court didn't approve it until 2009 on the issue that nobody would ever have an incentive to show up. Mr. Bashman was before this court attacking that settlement as well and attacking the fees on that case. In the Deepwater Horizon litigation, which the court also identifies, the settlement there was in 2012. The district court has issued an order saying that the fees will not begin to be considered until 2016. There's a reason for this in mass torts. When you have to implement the settlement, when you have to administer it, there's a huge amount of work that is unanticipated. It would have been absurd for the district court to entertain a fee petition in 2000 or 2001 in the Diet Drugs litigation because we know now that that case had to go through multiple iterations, multiple amendments, billions of dollars of additional compensation to the class, all realized by class counsel and other class lawyers, and that it took 43 appeals to this court so far to get all the mechanics of the deal worked out. There have been dozens of appeals in the BP litigation, so we have the experience that what we want to do is align the incentives of class counsel with the incentives of the class. We don't know how the class is going to do yet because we don't know what work remains to be had, and the intelligent approach is to sever the class recovery from the fee recovery. So if the total recovery for the class ends up being $2 billion, you're not going to go back to court for a fee enhancement? It would be a small contingency take if it goes up to $2 billion, but I just want to make sure I understand that's a static number we've got there. If it ends up going up to $2 billion under the current terms of the settlement, absolutely not, if there turn out to be different settlements, for example. New work. Well, it's not even new work, Your Honor. We're still litigating against Riddell. All of these plaintiffs have claims against the manufacturer of the equipment, and those claims did not settle. The PSC, class counsel in their role as PSC, is still prosecuting those claims, and there may be more money that comes from that, and then, of course, there will be a fee request at that point, but that's for additional work. For this, it is up to $112 million. Every class member is on notice of that. Every class member knows that the lawyers are going to get paid, and if I could just make one last point about adding things to the record at this point. Nobody, nobody raised the 23H argument below. Nobody, not any of the objectors, not even the amici. Nobody raised the demand that there be a full fee petition presented, and so if you go through Judge Brody's opinion where she meticulously analyzes every single claim that is put before her, you'll notice conspicuously that this one is not there, and as this court said in the insurance brokerage, it is the burden of the party that wants to raise an issue on appeal to make sure that this has been fully presented to the district court. Nobody made these outlandish allegations about Mr. Revin in the district court, and I will represent to this court that what Mr. Gupta said here today is just false, absolutely false. Mr. Revin does not represent anybody who has a qualifying diagnosis today. I don't know where he's getting this from, but the key thing is nobody presented it to the district court. If this had been presented to the district court and if this turns out to have been a fundamental conflict, which I don't believe it would be under any circumstances, the district court could have said, Mr. Revin, I don't think you're the appropriate person to represent this subclass. I'm going to substitute in somebody else, but it was not raised, and it is absolutely irresponsible to raise things here and then to lodge documents asking this court to basically create a new record and to lodge them in support of a reply brief on appeal. That's just improper, improper, improper, Your Honor. That cannot be tolerated in appellate practice. Thank you very much, Your Honor. Mr. Clement. Good morning, Your Honors, and may it please the court. Paul Clement for the NFL. The settlement reached here is fair, reasonable, and more than adequate. It provides nearly a billion dollars in compensation to class members who face serious obstacles to any judicial recovery. At the outset, there was a collective bargaining agreement alleged preemption, and that was a motion filed. Why was that not taken to getting the court to deal with that before you entered into settlement negotiations? Well, the district court judge heard oral arguments on that motion and then essentially suggested that the parties who were ripe for mediation and withheld deciding the motion in order for that mediation to run its course. And after a lot of exhaustive effort, obviously the mediation ran its course and produced the settlement. But I think in some respects, you know, if you listen to the objectors, they'd like to talk about this entire case as if that preemption defense did not exist. But, you know, if you look at the GERSH factors, there's nine of them. I'm not going to march through them for you here, but I'm happy to address any of them. But the gist of those factors is did the class get good value in this settlement compared to the relevant alternative, which is litigating these claims? And you can't have this discussion without recognizing that there is a serious legal obstacle to these claims in the form of preemption. It's not the only one. I mean, proven causation in a case like this would be an absolute nightmare for the class, and they recognize that in their affidavit the class counsel has filed. So these are real serious obstacles to pursuing these claims in court if you don't reach a settlement. And just one more word about the labor preemption argument, because I think it's quite critical, is on the labor preemption argument, you know, every defendant, of course, is going to think that they have some great legal argument in their back pocket. But this isn't just your sort of run-of-the-mill argument. In a number of analogous cases, we collect them in our brief, but in a number of analogous cases, this very client, the NFL, has prevailed on the labor preemption defense. You have two cases, Duerson and Maxwell, who are part of this case, only because they're originally filed in state court. They were removed to federal court. There was an effort to get them back into state court, and two different trial judges in this very case said that, no, they have to stay in federal court under complete preemption under the LMRA. And there's a few differences between the removal question and the preemption question as a defense, but not many. So you're talking about a case where there's nearly a billion dollars in value provided to the class in the context of a class that very well could get zero in terms of their judicial recovery if they pursue the alternative to settlement. And so I think that's why our friends on the other side, the objectors here today, do not really want to spend a lot of time talking about the Gersh factors, because the Gersh factors do keep pointing you back to, was this a good value settlement? And one of the factors that the court, of course, takes into account in doing the Gersh analysis is, how did the class react to this settlement? And I know the panel has alluded to it, so I won't belabor the point too much, but less than 1% objecting, less than 1% opting out, and all in a context where 25% of the class has individual counsel, which is a fact that you're going to have in almost no other class action. So in a lot of cases you might think, yeah, nobody's opting out, because who cares if you get a settlement, a coupon in the mail, right? But here these are personal injury claims. They are claims that many of the class members, 25%, thought were ripe enough and important enough to file an individual action, and yet they've looked at this and they say, boy, given all the problems that our claims would face if we litigated, this is a very good deal. Would you address the mechanisms in the settlement that might allow it to keep pace with the evolving science on CTP? No, I'd be happy to, Judge, and I think it's actually important, because I don't, as my co-counsel alluded to, I don't want you to put it in. You didn't make my mistake. We just tried to pronounce his name. Yeah, exactly, because I thought I was going to bypass that. I don't think you should put too much weight on those, because what they provide is a mechanism to keep pace with the science, largely in terms of making sure that the various qualifying diagnoses, if the medicine changes on those such that the way you diagnose Alzheimer's is different, or the way that you, you know, nobody's talked about dementia, but there's two qualifying diagnoses about dementia. If the way you diagnose those are different, then that's something that the parties are supposed to address and update the settlement for. The settlement does not really contemplate the idea that if there is some new disease that nobody contemplates is associated with CTE or playing football or MTBI, that's not really something that's within the contemplation of the settlement. Well, it's a little broader than that, isn't it? There are diseases we know exist, depression being one of them that isn't covered. But I guess your answer to that is, well, they weren't going to be able to prove that in a court of law, so it's reasonable to excise that from the settlement. Is that your ruling? That's exactly right, Your Honor. Because you do concede, do you not, Mr. Clement, that it's certainly possible that there could be a direct link between depression and repetitive concussive hits. There could be, Your Honor. I don't think the current science fully supports that, but there could be. Of course, another thing I think that's really important to keep in mind in thinking about the future development of the science is there's no guarantee it's going to develop in a way that particularly aids the plaintiffs as opposed to aiding the defendants. Again, it was alluded to already, but the science could determine that really all that matters for developing CTE is how many hits you take before your 18th birthday. And if the science actually proved that, then my clients essentially would have a great defense on causation in all of these cases, and yet there's no back-end opt-out for us. I mean, we're still going to be paying all the class members because those are the risks that both parties make when they enter a settlement like that, and that's not unique to class action litigation. It's not, you know, even when you're doing a regular case, an individual case, whether you litigate it or you settle it, you're likely either through res judicata or the terms of your settlement to release your future claims, and you go into court and you prove what you can prove. And another misconception I think here is a lot of the objectors want to say that, you know, there's no compensation prospectively for CTE. And, of course, at one level that's true. If you're sort of looking for the provision that provides compensation in hoc verba, it's not there. But what the settlement does, I think, is provide compensation for CTE in exactly the way that the current science allows and our litigation system allows. And so what you need is you need a manifestation of a serious injury. And so if you look at the conditions that the current science suggests are associated with CTE, and we're years and years away from causation, but association, what you get is things like Parkinson's and Alzheimer's, but what you principally get is what they don't want to talk about, which is the substantial compensation for what the settlement terms, mental impairment 1.5 and mental impairment 2, which map onto early dementia and moderate dementia. Those are the conditions that are major injuries that are currently associated with CTE. Those are compensated by the settlement going forward. And I think you're in a situation where, I mean, if you imagine somebody, they also like to make a big deal out of the fact that, well, at the complaint stage, everybody was talking about CTE and it sort of dropped out of the case. But I don't think that would be any different if you had a case of individual litigation. Because right now, and even probably in the future, just walking into court and saying, well, I think I have CTE, I'd like compensation, I mean, that's not the way the litigation system works. The way the litigation system works is to ask the question, okay, you want a pathology, that's CTE, but how have you been injured? And in just the same way, you know, if I think if somebody somehow says that some industrial workplace produces Alzheimer's, but I'm somebody who potentially could be diagnosed with Alzheimer's after the fact but had no symptoms, I don't think I could go into court and get any compensation with my Alzheimer's claim. What I need to show is the kind of injuries that would give rise to a compensable injury. And the way the settlement works, it provides compensation for those qualifying diagnoses, whether or not they're linked to CTE. And ALS is a great example. ALS is, you know, this wasn't just a CTE suit. This was a suit, a number of suits brought by football players for injuries that they claimed were linked to repetitive concussions or MPBI, and one of those is ALS. When did the science prove that there was a connection between concussive hits and ALS? I'm actually not sure of that. I mean, and I think that, you know, even on those issues, you know, I don't know that the science is fully developed, but the league was essentially in a position to say that as to ALS, that we're going to provide compensation under the settlement, and we're going to do it whether or not it ends up being linked to CTE or anything else. And in a similar way, I think this is also important, is that there's a demonstrated history here of the league, and through the collective bargaining process of providing expanded benefits to retired players, when the situation changes. And so, fully apart from this lawsuit. That's what I was going to ask you, is part of this buying labor piece? Well, because what you just said a minute ago sounded a lot like there's a sense of over-inclusion in terms of the qualifying diagnosis. Would you agree with that? I think this is a sufficiently generous settlement that I think you could think about it as being over-inclusive. I mean, your client is willing to do that because the settlement is in everyone's interest to move forward. Part of it, too, is we also want to work in the art of the possible, and so we want to provide compensation in a way that's going to be responsible but also isn't going to, you know, we don't want there to be compensable conditions that are, you know, very hard to diagnose, you know, because it creates the sort of potential for manipulating the settlement process. I think that's one of the reasons. That's why the over-inclusion doesn't extend to depression. That's not something we forgot about. You weren't willing to go there. We weren't willing to go there for the reason that you typically have defendants not willing to go somewhere in terms of a settlement, which is we thought, although all of these claims have problems, every one of them may well, in our view, every one of them is preempted, just to be clear. But when you think about the causation problems you would have proving a mood and depression claim and linking it to the hits that you took in football, because, first of all, you got all, you know, everything that, you know, we're all at risk of suicide. We're all at risk of mood and depression from a hundred things. So then you take the other compounding factor here, of course, is there are football-related risks that have nothing to do with the hits you take. I mean, if you took any group of people, I don't care if they're investment bankers or actors or football players, and you pay them a lot of money for a few years and you give them constant media coverage for a few years, and then after that you don't pay them that money and the media doesn't really cover them anymore. I mean, I would think that there would be some correlation to mood and behavioral problems as a result of that. So the idea that, you know, these claims that weren't compensated, was there anything arbitrary about that, or we forgot that there was something suggesting that was associated with CT? No. I mean, they were claims that we thought would be very, very hard for them to prove. I do want to circle back to how this relates to kind of a labor piece, though, which is I do think, especially in thinking about the future problem of what if the science changes, I mean, this is different from your normal class action. In your normal class action, the plaintiffs are, but for the litigation, are essentially strangers to the defendants. You know, I mean, if you buy a truck from somebody and the gas tank's in the wrong place, chances are you'll buy your next truck from somebody else and have nothing to do with that person. But with respect to this class and these plaintiffs and these defendants, I mean, you know, there is a sense of responsibility that the NFL has to the retired players. When the 88 plan and the NeuroCom benefits that are provided, wholly independent of this and preserved by this, which is something else that wouldn't happen in litigation, those benefits came through a process of collective bargaining. They were something that was provided when, essentially, the situation changed. So I'm not here to make any representations about what's going to happen in the future. I'm just saying that you have this ongoing relationship, and part of that, and the very fact that there were benefits provided by the collective bargaining agreement, of course, gets you back to the preemption defense, which is this is unlike most other litigation. You do have this relationship. The manifestation of that relationship is the vast, vast majority of the class members were subject to a collective bargaining agreement. We had preemption defenses that went to every single member of the class. Maybe that a couple of people were in the league at a time where the collective bargaining agreement had lapsed. But even as to them, we had an argument that went to preemption for them. And all of that, despite all of those risks of an absolute zero recovery, you had compensation here. I'll just say one last thing about the CTE issue because I do think that, you know, they raised the concern about not compensating the people prospectively and compensating the people who are deceased before the final settlement date. As Judge Brody found, and, you know, there's been a lot of discussion about a lot of things, but not enough discussion of what Judge Brody found because her findings are subject review for deference. If they're factual findings, it's for clear error. What she found is that the people who died before the final approval date were different from everybody else in two ways. One, because they died, they could be definitively diagnosed. But second, and equally important, those individuals were not on notice that they had to get a medical diagnosis that was a qualifying diagnosis and reconstructing that after the fact is fraught with difficulties. So the word she used is those are a proxy. The word they got was a proxy for the qualifying diagnosis. Now, going forward, you get the qualifying diagnosis with the exception of mood and behavior, which we've talked about. You get compensation for the things that the science currently associates with CTE. You also get something else that hasn't been mentioned nearly enough here, which is you get the baseline assessment program, the BAP, which is part of the settlement. And that not only gives you sort of an assessment of where you are, but particularly if you have what the settlement deems impairment level one, you get a suite of benefits right from that that helps you with counseling, that helps you with prescription medicine. And so obviously we're concerned about people prospectively, and we don't want there to be people in the future that have the kind of behavioral problems and the like. But it's not like the settlement does nothing for them. And Judge Ambrose alluded to, you know, the various ways of slicing and dicing this, 89 percent or 17 percent or whatever the percentage of people who aren't going to get benefits under this. I mean, part of the answer is if you make it all the way through this and you don't have one of the qualifying diagnoses, that sounds like a pretty good deal. But the second thing is everybody is going to benefit from the baseline assessment program, every single class member. And that's something that wasn't available to the people who were deceased before the settlement date. So there are differences here in the way they're treated, but they reflect reality, and it's not like Judge Brody didn't focus on this like a laser beam. Thank you very much. Mr. Miller? Or Mr. Gupta? I'm going to try to make three quick points. Mr. Gupta is on the record. I'm going to try to make three quick points. The basic takeaway is a settlement, yes, but not this settlement, not with basic structural assurances of fairness. And the first point I want to talk about is the substantive disparity, which you asked about, why this stark dividing line. And I think you've got two answers. From Mr. Zakharoff and Professor Zakharoff, you heard that this was a humanitarian exception, which I think is an acknowledgment that it is a deviation from what you would expect, and there needs to be some explanation. The exemption he said covered, what, 50 or 60 players? Is that right? You know, I don't know the total number of players. Was I correct as a matter of fact that Mr. Mackey was one of them, or am I incorrect? That's right. But the point is, the argument that I think you heard from both Mr. Zakharoff and Mr. Clement is that this is an approximation of what they would get under the terms of the deal, so there's nothing awry here. And the problem with that is that if you look at class council's own estimates, that's not correct. Those are at appendix 1573. They say that the average payment for the people in that first group, the group for which the exception is made, is $1.4 million. But for those who get what they say is a proxy, the dementia diagnosis, it's $190,000. So the difference between those two awards is many, many times different. It's, you know, I think seven times different. And that is a disparity that can't be explained, and there is no explanation for it. I want to make sure that the court understands the 72% number that's been batted around. You can find that at appendix 1585. I think I urge the court to take a look at that exhibit. That's a projection, class council's own projection, of how many people will get nothing in the future, right? It's not how many people are eligible for qualifying diagnoses. That's the percentage of the class that they say will not get any qualifying diagnosis. But that projection could change. Right. Well, I mean, the projection could change a little bit, but could change a lot. We have no idea how much it will change. That projection isn't based on the science around CTE, right? That projection is about these qualifying diagnoses. And so it doesn't address the conditions that are associated with CTE, which aren't even compensated under the settlement. There's no reason that's ten years from now that may change significantly. Right, exactly. I think the change in science is a point in our favor, right? That's a point that Georgina then can make, that if you had somebody negotiating, and this brings me to the structural point that I want to make, if you had somebody negotiating for these people, they would negotiate for a deal that kept pace with science. So on the structure, why wasn't there a good structure to represent these people? There is no explanation you heard, really, about why they couldn't go to the judge. I'm sure the judge could have found someone qualified to represent, to provide true independent representation for these folks. You mean the 72%? Right, exactly, for those people. Those people should have been represented. Well, you have a subclass that says if somebody doesn't have a qualifying diagnosis today, but has it tomorrow, that subclass is covered, and tomorrow there is a mechanism in the settlement for dealing with them, correct? Right, but the problem with that is that that subclass wasn't created until after the qualifying diagnosis framework was set up. So after the deal was already hashed out, the same lawyers appointed one of their own to say that that person was But a person not covered today, who tomorrow, based on this baseline assessment, for example, or going to his own doctor, has a qualifying diagnosis, that person will be covered under this settlement. If the person has a qualifying diagnosis, that's right, Your Honor, but the problem is that the qualifying diagnosis framework doesn't address CTE, which is what the litigation was all about. It doesn't include the mood disorders that are part of CTE. It doesn't include compensation. At the end of the day, there's a huge disagreement regarding the scope of the qualifying diagnosis. That's right. They say it's just right. You say it doesn't cover nearly enough. Right, right, and you're going to have, you know, when you look at a settlement, someone's always going to say you could have done better. Someone's going to say this was good enough, and those are hard questions to decide, right? And that's why I think the case law that's developed, particularly in this circuit, looks at whether there are structural assurances of fairness, because that is something you can sink your teeth into. And the problem here is that you didn't have truly independent representation for those folks, and there's no good answer for why they couldn't go to the judge and get someone to do that. And finally, and I just want to make, as a point of personal privilege, Mr. Zakharoff said, I said something that's not true. I'm not representing to the court that Mr. Levin is currently representing clients that have a qualifying diagnosis. I don't know that. We presented the court in our judicial notice motion with those complaints, so you can see that he's unquestionably representing people who claim present injuries while simultaneously representing the future subclass. And finally, just on the point of fees, there's no good reason that I don't think you've heard from the other side why you couldn't have supplemental fee applications. What you can't do, as this court said in GM Trucks, make the fee application part of any thorough consideration of a supplement. But if there's additional work, you can have a mechanism for supplemental fee applications, and that happens all the time. What you have never seen is a court of appeals approving a complete deferral of any consideration of fees as part of a settlement. Is there anything that requires that the fees must be considered at the same time as the settlement? What Judge Posner and the Senate and the Circuit have said is that if you meet a 2038... And it's a dissent, right? No, that's what you already approved, and that's a reason... It may be, and look, I understand what his reasoning is, but beyond that, what else? Well, what Judge Posner is saying is that if you read Rule 23H and Rule 23E in conjunction with one another, they require that the objectors have the right to object to the settlement and to a fee application. And the fees are the... In the district court. ...in the term of any settlement. And was that done in the district court? It was not done in the district court. The district court said... So what should we do about that now? I mean, how could his court have been wrong on that if it wasn't even presented to us? Well, I think the error occurred when the district court approved the settlement without a fee application. Was there any objection in the district court at all? There was none. And there were 83 objections filed in this case. Right, but the objectors, of course, couldn't... 84 could have been that, and that's a big number. Well, that's right, but at the time the objections were filed, of course, the objectors couldn't know that the judge was going to approve the settlement without requiring a fee application. So why was that not a waiver? I think it's not a waiver because the error occurred at the time that the district court approved the settlement. Was there a motion for reconsideration filed? There was a motion. There should have been. That's a forfeiture. It's not like the Mercury case from the Ninth Circuit, which I urge you to take a look at, Judge Posner cites it. In that case, the court said, look, this wasn't raised below, but we have to address it because it's a critical question of class-action governance. If we don't address this and say that this is not okay, prospectively you're going to have settlements that are approved without even a fee application, and that goes critically to adequacy of representation and assessment of what the lawyers did, whether they earned their fee. And before you approve a settlement with $113 million that nobody is going to contest down the road, you at least ought to have a fee application. What you were going to say in response to our question on this was that regardless whether you consider it a waiver or regardless whether you consider it a forfeiture, it's a structural problem. Exactly. That's what I'm trying to say. You said it better than I did. It goes to the heart of the settlement. It's an integral term of the settlement. You cannot approve it without considering that. And, of course, the other side hasn't claimed waiver in their briefs, and it's up to you to decide. Prudentially, of course, you can consider it, and I think you should. Thank you very much. Mr. O'Brien. Thank you. I want to talk about preemption because we raised it in our briefs, and our position on preemption is it seems to be a subject matter jurisdiction issue, and we shouldn't have the NFL saying, hey, you're preempted, the settlement's fair enough. They're either not preempted or they are preempted, and we specifically ask this question. No, that's not. Even if they think they have a 90% chance of prevailing on their preemption argument, they might see value in settling the case because the potential damages are so high, not to mention the specter of the value of the legal fees that they would continue to incur for some 5,000 cases. Our position, Your Honor, is that either this court has subject matter jurisdiction or it doesn't, and it has an independent duty to determine subject matter jurisdiction. And if preemption's raised as a subject matter jurisdiction bar, then it has to be addressed, and it shouldn't be used. And no settlement can occur. No, I think the preemption defense fails. It fails. Nobody ruled on it. The judge didn't rule on it. But what they're saying is that because it wasn't ruled on, maybe they're 101. No, what they're saying is they thought they had a strong argument, and they decided ultimately at the suggestion of the court to go to the negotiating table. I mean, that sounds like standard fair. Standard fair. Okay. Our position is that the court has a duty to determine that there is no preemption. Regarding Dalbert. Was anything mentioned on Dalbert? Yes. Well, if you don't want to hear it from me, that's fine. I don't know if there's anything, but you handled that pretty well on your opening. Okay. Thank you, Your Honor. Thank you. Sure. Just following up on preemption, I understand and agree that there is a meaningful preemption argument in the case. But in the end, the NFL isn't paying, Judge, to your point. They're not paying hundreds of millions of dollars simply because they thought they might win. They're also paying because they thought they might lose. And because even if they did win, in the end, these cases just go to arbitration, and the liability is still there. That sounds like why we have settlements. That is why we have settlements. And so the Bush factor analysis and the prudential factor analysis, even accepting the significant force of points made by Mr. Clement, argues in favor of settlement. It argues in favor of some global resolution of this thing, but not on the back of 15,000 people who will get nothing. All right. Thank you. Mr. Morrow. Thank you very much. Just going to pick up on the point Mr. Clement made, which is the fundamental question is, did the class get good value? And the answer is some of the class got good value. But the class as a whole, and particularly those who have future claims for CTE, did not get good value. There's no question. It sounds like 99% of the class is willing to accept the value that's been offered. Well, that doesn't mean that it's a fair settlement. And, in fact, the NFL has assigned a significant value to these future CTE claims by insisting on CTE in the release. And when we talk about these advances in science and the fact that there's not more often than once every 10 years, there's supposed to be this revisiting of the settlement, it's specifically in Section 66B accepts CTE, changing CTE as a qualifying diagnosis. So there's clearly, clearly a value that has been placed on CTE by the defendant and future claims of CTE, and they've compensated it with an award of up to $4 million now. And this idea of the dementia diagnosis somehow satisfying an obligation to deal with people with CTE is just not true. I mean, first of all, as we point out in the brief, there's a chart that lays it out. People with Stage 1 and 2 CTE, which are equally dangerous to 3 and 4 in certain respects, get nothing. And if you rise to a level of 3 or 4 of CTE and then qualify under either of these two dementia diagnoses, the amount of the awards are quite a bit less. At the end of the day, Judge Brody did try very hard. And I will say, frankly, that the class counsel and the NFL tried very hard. Yes, there were procedural and structural defects. Whether they're there or not, the settlement is unfair. And so I think that that should be the starting point. We look at those distribution terms, and we ought to go back to the district court. She can decide whether or not to appoint counsel to pursue the CTE claims. Maybe our motion that we had filed to intervene, which started all of this off, would be revisited, and we would be allowed at least to intervene. Or maybe the parties could just come up with a solution to CTE like they did for the NFL Europe issue themselves. But in any event, this settlement can't stay. We appreciate the time this morning. This has been a very generous allotment of time. I'm sure I'm speaking for all the parties to say that. I want to thank all counsel for extremely well-presented arguments without fail. I would ask that if you would get together with the clerk's office, have a transcript prepared of this oral argument, and I would ask that it be split evenly half to the side, and then if the NFL would pick up the other half. Thank you very much.